UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

CARL D. CHASE,

                          Petitioner,              **DECISION AND ORDER**

    -vs-                                            No. 01-CV-6028

JAMES BERBARY, Superintendent,

                          Respondent.

_____

## INTRODUCTION

Carl D. Chase ("Chase") filed this *pro se* petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 challenging his conviction in Erie County Court on one count of first degree

rape and one count of endangering the welfare of a child. The parties have consented to

disposition of this matter by the undersigned pursuant to 28 U.S.C. §636(b).

## FACTUAL BACKGROUND AND PROCEDURAL HISTORY

Chase was charged on May 16, 1996, with raping the eight-year-old daughter of the

woman with whom he was having a romantic relationship at the time. The indictment contained

two counts: rape in the first degree (N.Y. Penal Law § 130.35(3)) and endangering the welfare of

a child (N.Y. Penal Law § 260.10(1)).[1] Chase's jury trial commenced on July 7, 1997, in Erie

County Court (DiTullio, J.). A summary of the relevant trial testimony follows.

_____

[1] Chase was tried previously on these charge at a jury trial conducted from January 28, 1997, to February 5,
1997. This trial ended in a mistrial, however. *See* Petitioner's Appellate Brief at 2, attached as Exhibit B to
Respondent's Appendix of Exhibits ("Resp't App.") submitted in connection with its Answer to the Petition. The
reason for the mistrial is not apparent in the record.

In April of 1996, Barbara Goodrum ("Goodrum") lived with her eight-year-old daughter ("the complainant" or "J.D.") in the City of Buffalo. Prior to January of 1996, she had had a sexual relationship with Chase, a part-time deputy sheriff who worked at the county jail. Chase regularly provided Goodrum with financial assistance and bought things for her and her daughter. In January 1996, Goodrum decided that she needed to take a vow of celibacy as part of her effort "to turn her life around." According to Goodrum, Chase had no quarrel with this decision and they continued to see each other socially. Goodrum described Chase as a "gentleman" and rather passive.

On April 24, 1996, Goodrum left work, picked up her daughter at the East Ferry YWCA after-school program, and arrived home between 5:30 and 6:30 p.m. Chase telephoned Goodrum between 6:30 and 7:00 p.m. and said that he wanted to get together. When Goodrum stated that she had just purchased a VCR but did not know how to hook it up, Chase offered to do it for her. T.280-81.

Goodrum testified that she put J.D. to bed at 8:45 p.m. that she was asleep by 9:00 p.m. T.239-40. Between 11:30 and 11:45 p.m., Goodrum went across the street to her mother's house to borrow an iron. T.241. She checked on her daughter before she left, and J.D. was still asleep. As Goodrum was leaving her house, Chase was pulling up in the driveway. T.242. She told him where she was going to her and continued on her errand. Goodrum returned moments later, went through the front gate, entered the house, and encountered Chase, who was coming into the kitchen from the front sitting room. T.253. Chase commented that she did not have anything to drink and asked if she needed anything from the store. When she replied affirmatively, he handed her a twenty-dollar bill and said that she could go get what she needed. T.254. Goodrum put on

sweatpants and a jacket and left the house. T.255. Before leaving, she noted that her daughter

was still asleep. At that time, Chase was hooking up the new VCR.

Goodrum walked to the twenty-four-hour convenience store at the corner, which took

"five or ten minutes at the most." T.257. She purchased beer, cereal, milk, and some snacks for

her daughter, and chatted with the store owners for several minutes. T.258. She stated that she

was not in a hurry to return home since her daughter had been in Chase's care alone before

without any problems. She estimated that her trip to the store and back home took about twenty-

five minutes. T.258-59.

When Goodrum returned home, she noticed that Chase's socks and shoes were off; one

sock was in the kitchen, and his sneakers "were going into [her] sitting room by the sofa." T.259.

Goodrum put the groceries down on the kitchen table and went to get changed. Goodrum went

into her daughter's bedroom and saw that she was "moving around in the blanket . . . like she

was hiding her head[.]" T.261. Goodrum turned on the light and asked her daughter what she was

doing awake, at which point J.D. said, "Come here." T.261. Goodrum noticed that her  daughter

"had water in her eyes and she was looking like kind of frantic like" and had "a little tremble to

her." *Id.* Goodrum asked, "What's wrong?" Her daughter "grabbed [her] real tight" and said,

"Where you been?" Goodrum said that she had gone to the store. Her daughter then said, "Don't

leave me." Goodrum laid down on the bed with her because J.D. was still clinging tightly to her,

and stayed with her until she went to sleep. T.261.

Goodrum walked in to the sitting room where Chase was "slouched down on the sofa."

His pants "were not fastened all the way and they were coming off his waistline." T.264. His belt

was hanging off the loops and he did not appear to have underwear on, although Goodrum stated

that it was not Chase's normal practice to wear underwear. T.264. Goodrum asked Chase if he

heard that J.D. was awake. Chase responded, "No." When Goodrum asked Chase if he was sure,

he "very quickly" said, "I didn't move from this couch." T.265. At that point, Goodrum said, the

situation "didn't feel right"–her daughter was awake at midnight, which was unusual. Concerned,

Goodrum began pacing around the downstairs. Chase then told her to get him a Heineken. She

did so, and they watched all of the videotapes he had brought. Goodrum said her mood was

"distant" and that she sat at the opposite end of the couch. Chase left at about 3:30 or 4:00 a.m.

The next morning, Goodrum woke up her daughter at 6:30 a.m. While watching the news,

Goodrum heard that her friend Pamela Ingram had been murdered the previous night. She

became hysterical. J.D. tried to talk to her, but Goodrum was not in any condition to listen.

Goodrum rushed her daughter out to the bus stop and then went Ingram's relatives' house for the

day. When Goodrum picked J.D. up from the YWCA at 5:30 pm., she was told that J.D. had not

acted like herself that day. When Goodrum brought J.D. back to Ingram's relatives' house, J.D.

acted like a "little baby" and would not leave her mother's lap. J.D. wanted to go home even

though there was candy, food and other children to play with.

Later that night, after they returned home, J.D. told her mother that "Mr. Carl" had come

into her room the night before and "something pricked her girl thing." T.274. She was sure it was

Chase because she saw his glasses. T.274. When Goodrum asked what else happened, J.D.

became scared and refused to divulge any more details, saying that she did not remember. When

J.D. asked her mother what she was going to do, Goodrum replied that she would take care of it.

The next day, which was Friday, April 28, Goodrum sent her daughter to school as usual.

That night, she called Chase at his home. He claimed that he did not leave the sofa on the night

of April 26. T.276. When told what the complainant had said, he stated that he had a niece and

would not do anything like that. Goodrum asked Chase how J.D. could have known that Chase

was there that night since she had been in bed and asleep when he arrived. Chase could not say.

Chase then changed the subject and asked Goodrum how she was fixed for money. T.276-77.

When Goodrum stated that she was going to get to the bottom of the incident, Chase said that he

would hire the best lawyer money could buy. He stated that her accusations would "backfire" on

her and she would lose her daughter. Goodrum was worried that this was a possibility since she

had a history of several petty larcenies and misdemeanors. T.279-82.

Chase called her again that night to find out what she was planning to do. When she told

him that she was going to prosecute, he became "arrogant" with her. Goodrum then called a

friend of hers on the Buffalo police force and asked for advice. She was told that if she was

unsure about the accusations, she should "drop it," but if she was sure, she should "take it all the

way." T.283. After that phone call, Goodrum went to talk to a couple of the "tough guys" that

lived in her "highly drug infested neighborhood" about putting a "hit" out on Chase. T.284. The

two men agreed to do it "cheap" for about $250 or $300. T.284. However, Goodrum would not

have the money to pay them until her pay day the following week.

Meanwhile, the complainant had spent Friday night at her grandmother's house. On the

morning of Saturday, April 29, the grandmother called Goodrum to say that J.D. had slept very

poorly the night before–she was "kicking, whining and saying no." T.285. As a result of that

conversation, Goodrum reported the suspected rape to the police but did not give them Chase's

name. T.286. The police told Goordum to bring J.D. to be seen by a doctor. T.286.  When J.D.

returned home from her grandmother's a little later that day, she complained that her "girl thing"

was hurting. T.287.

Goodrum brought her daughter to the Deaconess Treatment Center to be examined. J.D. was extremely uncooperative and would not let the doctor examine her, so they left. When they returned home, Goodrum told J.D. that she was going to have Chase "knocked off." Her daughter said, "Don't do that. Just call the police." T.288. She said that Goodrum would go to jail and "she would lose her mommy." T.288.

The following Wednesday (the day before Goodrum's pay day), J.D. did not want to go to school. As Goodrum was getting ready to leave for her noon swing shift, the school called and said that she must come get J.D. immediately because J.D. had broken out into hives all over her body. T.289. J.D. had never had that kind of reaction before. Goodrum took her to Health Care Plan where she was seen by nurse practitioner Kathy McDonnell ("McDonnell") . T.291. Neither Goodrum nor J.D. mentioned the suspected rape at first, but during the physical examination, Goodrum suddenly asked McDonnell whether it looked as though J.D. had been abused. T.452. McDonnell asked Goodrum what she meant, and Goodrum said she wondered whether the child could have been touched. T.452. At that point, McDonnell had J.D. get dressed so she would feel more comfortable.

McDonnell attempted to question J.D., but she was very reticent and really did not answer. Goodrum started to get upset and interrupt, asking, "Did he touch you, did Mr. Carl touch you?" T.452. McDonnell then asked Goodrum to leave the room. When McDonnell questioned J.D. about what had happened with Chase, J.D. said that "Mr. Carl put his dick into where she peed." T.455. J.D.'s vaginal area appeared to McDonnell to be red and irritated, more red than what would normally be seen. T.456. McDonnell also noticed some milky discharge and

some clumping of whitish material around the labia, which made her suspect that J.D. had a yeast infection. T.457. Finally, McDonnell observed that the vaginal opening appeared irregular in shape, and there were two possible tears in the tissue. T.457.

McDonnell then sent J.D. to undergo a rape exam at Children's Hospital. Dr. Michelle Penque, the resident who saw J.D., was not able to do a thorough exam because J.D. was combative and needed to be restrained. T.497-98. However, Dr. Penque was able to see that there was "marked amounts of erythema or redness" in the vaginal area. T.501. She also felt that J.D. could have had a yeast infection, which was uncommon in a normal eight-year-old girl.

On May 2, 1996, J.D. was seen by Dr. James Canavan, a pediatrician with expertise in treating cases of sexual abuse in children. T.520. During his examination of J.D., Dr. Canavan found that the entire vaginal area was reddened and there was an off-white discharge. T.521. The colposcopy revealed fissures at "5:30" and "7:00" in the back wall of the vagina. T.524, 528. The nature and placement of the tears had specific significance in terms of Dr. Canavan's assessment that it was extremely likely that J.D.'s vagina had been penetrated by a male penis. T.528, 529. He testified that the fissures were consistent with an erect penis having entered the victim's vagina while the victim was in a supine position. T.530, 532. In fact, he stated on cross-examination, it was a "high 90 percent likelihood" that an erect penis caused the fissures he saw in the victim's vaginal tissue. Dr. Canavan further testified, to a reasonable degree of medical certainty, that the fissures were not caused by J.D. scratching herself. T.530. Dr. Canavan also stated that it was possible to have the hymen intact yet still have fissures or tears caused by a penis. T.533.

J.D. testified that when she said, "Mr. Carl did a bad thing to [her]," she meant that he

"put something in [her]." T.421. She stated that while she was lying on her back in bed that night, Chase put his "d-i-c-k" [*sic*] into her "girl thing." T.422. She said that Chase lifted her nightgown up and moved her underwear aside. T.423. J.D. testified that she was sure that Chase was the one who did this; she recognized his glasses. T.424. She related that it "hurt a lot" but she did not cry or yell for help because she knew that her mother was not in the house and she was scared. T.424. J.D. testified that she was "pretend asleep" but she was really awake while Chase did the "bad thing" to her. J.D. stated that Chase did the "bad thing" for a "little time" but stopped after the gate slammed, which meant that her mother was home. T.425.

Sheri Bell, a certified social worker, was qualified as an expert, T.566-67, and testified regarding the characteristics of child sexual abuse syndrome. T-582. The court briefly instructed the jury that, under the law, Bell could not conclude whether J.D. suffered from child sexual abuse syndrome. T.587.

Chase did not testify in his behalf, but he did call three character witnesses: a former girlfriend and her niece, and a childhood friend who had not had much contact with Chase since college. They testified as to his propensity for truthfulness and honesty and his "peaceful" nature.

Finally, a private investigator testified for the defense that he traced the route that Goodrum took to the corner store, walked around the store, purchased a few items, and walked back to Goodrum's house. T.654. The videotape of this was introduced into evidence; the total trip, according to the tape, took only about nine minutes.

On July, 15, 1997, the jury returned a verdict convicting Chase of both counts of the indictment. On October 1, 1997, Chase was sentenced on the rape charge to an indeterminate sentence of 8 to 16 years imprisonment. A concurrent one-year sentence was imposed with

respect to the endangerment charge.

On direct appeal, Chase's appellate counsel argued that he was denied his Sixth Amendment right to a public trial; that the trial judge was not fair and impartial; that he was denied his right to effectively cross-examine the complainant; that the expert witness who testified concerning child sexual abuse syndrome impermissibly bolstered the complainant's testimony; that the prosecutor committed gross misconduct on summation; that the prosecutor improperly referred to religion and God; that the properly vouched for the credibility of the expert witness and all of the medical witnesses; that the prosecutor improperly commented on petitioner's request to consult with an attorney; that the trial court improperly allowed the prosecutor to define legal concepts on summation; and that the prosecutor unfairly attacked defense counsel. *See* Petitioner's Appellate Brief, Resp't App. Ex. B. The Appellate Division, Fourth Department, of New York State Supreme Court unanimously affirmed the conviction on October 1, 1999. *People v. Chase*, 265 A.D.2d 844, 695 N.Y.S.2d 792 (App. Div. 4th Dept. 1999). The New York Court of Appeals denied leave to appeal on February 10, 2000. *People v. Chase*, 94 N.Y.2d 902, 728 N.E.2d 985, 707 N.Y.S.2d 386 (N.Y. 2000). Chase did not pursue any collateral attacks on his conviction.

This petition for habeas relief pursuant to 28 U.S.C. § 2254 followed. In its answer to the petition, respondent interposed the defenses of procedural default with respect to Chase's claims that he was denied his right to a public trial; that the trial judge committed misconduct; and that expert witness testimony regarding sex abuse syndrome in children was improperly received. Respondent has not raised the defense of non-exhaustion and, indeed, all of Chase's claims appear to be fully exhausted. *See* 28 U.S.C. § 2254(b)(1).

For the reasons set forth below, Chase's petition for a writ of habeas corpus is denied.

## DISCUSSION

**<u>Procedural Default</u>**

The Supreme Court has made clear that the "adequate and independent state ground doctrine applies on federal habeas [review]," such that "an adequate and independent finding of procedural default will bar federal habeas review of the federal claim, unless the habeas petitioner can show cause for the default and prejudice attributable thereto, or demonstrate that failure to consider the federal claim will result in a fundamental miscarriage of justice." *Harris v. Reed*, 489 U.S. 255, 262 (1989) (citations and internal quotations omitted); *see also*, *e.g.*, *Schlup v. Delo*, 513 U.S. 298, 314-16 (1995). A procedural default occurs when, for example, the defendant fails to follow a state procedural rule at trial, such as the New York rule requiring a contemporaneous objection at the time of the alleged error. *E.g.*, *Fernandez v. Leonardo*, 931 F.2d 214, 215 (2d Cir. 1991) (citing N.Y. Crim. Proc. Law § 470.05(2)). "[I]n order to preclude federal review [under the adequate and independent state ground doctrine], the last state court to render judgment must 'clearly and expressly state [ ] that its judgment rest[ed] on a state procedural bar.'" *Jones v. Vacco*, 126 F.3d 408, 415 (2d Cir. 1997) (quoting *Glenn v. Bartlett*, 98 F.3d 721, 724 (2d Cir. 1996), *cert. denied*, 520 U.S. 1108 (1997)).

**<u>Standard of Review</u>**

To prevail under 28 U.S.C. § 2254, as amended by the 1996 Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), a petitioner seeking federal review of his conviction must demonstrate that the state court's adjudication of his federal constitutional claim resulted in a decision that was contrary to or involved an unreasonable application of clearly established

Supreme Court precedent, or resulted in a decision that was based on an unreasonable factual

determination in light of the evidence presented in state court.  *See* 28 U.S.C. § 2254(d)(1),

**Grounds Raised in the Petition**

**1.     Denial of Sixth Amendment Right to a Public Trial**

Chase argues that the court's *sua sponte* closure of the courtroom during the testimony of

the child complainant denied him his Sixth Amendment right to a fair trial. Respondent

contends that this claim is procedurally defaulted and points to the Appellate Division's holding

that the issue was not preserved for review due to defense counsel's failure to object. *See People

v. Chase*, 265 A.D.2d at 844 ("Because defendant failed to object to closure of the courtroom, he

failed to preserve his contention for our review. In any event, the court's limited closure of the

courtroom during the testimony of the infant complainant did not constitute a denial of

defendant's constitutional right to a public trial.") (internal citations omitted).

In the present case, there has been a procedural bar since the Appellate Division

"explicitly invoke[d] a state procedural bar rule as a separate basis for decision,"*Harris v. Reed*,

489 U.S. at 264, namely, New York's contemporaneous objection rule, N.Y. Crim. Proc. Law §

470.05. *See also Garcia v. Lewis*, 188 F.3d 71 (2d Cir. 1999) (trial court concluded that a drug

defendant defaulted his Sixth Amendment claim, *i.e.*, that his right to a public trial was violated

by the exclusion of his mother's companion from the courtroom during the testimony of an

undercover officer, when his attorney failed to raise the issue at trial in accordance with New

York's contemporaneous objection rule, N.Y. Crim. Proc. Law § 470.05; circuit court found that

this was an independent and adequate state ground of decision barring federal habeas review of

the claim);[2] *Coleman v. Thompson*, 501 U.S. 722, 729-30 (1991).

Chase alleges neither cause for, nor prejudice resulting from, the procedural default of the public trial claim, and the Court finds neither on the record before it. In any event, were the Court to rule on the merits of this claim, it would find no violation of Chase's Sixth Amendment rights. The closure was extremely brief; the court merely told the deputies not to let any individuals into the courtroom during the child complainant's testimony, and there is no indication in the record that anyone actually was denied access to the courtroom during that time. It was for the purpose of protecting the privacy of the child complainant while she testified about a disturbing event of a very sensitive nature. Notably, defense did not make even a perfunctory objection to the limited closure that occurred. It is obvious that the brief courtroom closure here did not affect the fairness of the trial or alter its outcome, nor did it undermine the core values that the Sixth Amendment aims to protect. *See Brown v. Kuhlmann*, 142 F.3d 529, 534 (2d Cir. 1998); *accord*, *Carson v. Fischer*, 421 F.3d 83, 93 (2d Cir. 2005).  Under these circumstances, no purpose would be advanced by overturning Chase's conviction on this ground.

**2.      Trial Court Error**

Chase contends the trial judge was not fair and impartial and that the judge's conduct denied him a fair trial by "undercutting the defense," "inappropriate gesturing and tone of voice," and "misstate[ing] . . . the basic presumption of innocence. *See* Petitioner's Memorandum of Law at 6 (Docket #5). Respondent asserts that these claims are procedurally defaulted.

On direct appeal, the Appellate Division held that "[d]efendant failed to object to most of

---

[2]   The Second Circuit's clear holding in *Garcia* precludes Chase's argument, *see* Petitioner's Memorandum at 4 (Docket #5), that the alleged closure involved a fundamental error concerning the organization of the court and the mode of proceedings making it reviewable even in the absence of an objection.

the alleged instances of improper conduct and thus failed to preserve those instances for our review[.]" *People v. Chase*, 265 A.D.2d at 844 (citing N.Y. Crim. Proc. Law § 470.05 (2)). In light of this holding, there has been a procedural default. The Second Circuit has held that the failure to object at trial when required by New York's contemporaneous objection rule is an adequate and independent state ground. *See, e.g., Fernandez v. Leonardo,* 931 F.2d 214, 216 (2d Cir.), *cert. denied,* 502 U.S. 883 (1991); *see also Murray v. Carrier,* 477 U.S. 478, 485-92 (1986). The Appellate Division therefore was justified in relying on New York's contemporaneous objection rule to hold that Chase's claim concerning trial court error was not preserved for review.

Because Chase has failed to make a showing of cause and prejudice, or that a fundamental miscarriage of justice would occur if the Court declines to review these claims, Chase cannot overcome the procedural bar. The Court only may review the following instances of alleged error by the trial judge to which defense counsel objected: (1) "the judge attempted to make the two defense attorney's [*sic*] look foolish by giving different ruling[s] on when each attorney should sit up or down while addressing the judge in regard to trial objections," and (2) "the judge made a practice out of admonishing the defense attorney's [*sic*] before the jury, such as after the defense delivered its opening statement." Petitioner's Memorandum of Law at 7 (Docket #5).

The Appellate Division held that these claims were lacking in merit, and this Court concludes that neither warrant habeas relief. As to the first, the court found that the trial judge "properly admonished defense counsel for using off-color slang during his opening statement." *People v. Chase*, 265 A.D.2d at 844 (citation omitted). As to the second claim, when defense

-13-

counsel objected to leading questions by the prosecutor, the court ruled on the objections and directed defense counsel to "sit down." As the Appellate Division found, "[t]hat directive did not demonstrate bias, but rather, was part of the court's function 'to enforce propriety, orderliness, decorum and expedition in trial.'" *Id.* (citation omitted). While the better practice would have been to speak to the defense attorney at a sidebar, out of the jury's hearing, the Court cannot find that Chase's right to a fair trial was fundamentally impaired as a result of the trial judge's conduct.

**3.      Improper Introduction of Expert Witness Testimony**

Chase contends that the expert testimony of the social worker concerning child sexual abuse syndrome was impermissibly received at trial for the sole purpose of bolstering the testimony of the infant complainant. Defense counsel objected to the expert witness on the basis of alleged deficiencies in her qualifications, but he did not raise the bolstering issue. The Appellate Division, on direct appeal, held that defense counsel "failed to object to the social worker's testimony on that ground and thus failed to preserve his contention for our review." In any event, the court held, the claim was without merit. *People v. Chase*, 265 A.D.2d 844 (citing *People v. Donk*, 259 A.D.2d 1018, 1019 (App. Div. 4th Dept.) ("The expert testimony was properly introduced to explain the hesitancy of child abuse victims to disclose the abuse[.]") (citations omitted), *lv. denied*, 93 N.Y.2d 924 (1999).

Respondent correctly asserts that the Appellate Division's reliance upon a state procedural bar rule created a procedural default which precludes this Court from considering the claim. Absent a showing of cause for the default, and prejudice attributable thereto, Chase cannot overcome the procedural default. In any event, even if Chase's evidentiary claim were preserved,

it presents a question of state evidentiary law which is not ordinarily cognizable on habeas

review. *See* 28 U.S.C. § 2254(d)(1), (2). Were the Court to consider the claim on the merits, it

would be compelled to deny habeas relief.

**4.       Prosecutorial Misconduct**

As bases for his claim of prosecutorial misconduct, Chase relies upon the same comments

that he challenged in his direct appeal. Respondent "submits that the prosecutor's comments

were appropriate, and any errors were rectified by the court's curative instructions."

Respondent's Memorandum of Law at 21 (Docket #9).

On direct appeal, the appellate division held as follows:

> We agree with defendant that several of the prosecutor's remarks on summation
> were improper because they denigrated the defense, were inflammatory,
> improperly referred to God and religion, improperly commented on defendant's
> request to consult with an attorney, and vouched for the credibility of the People's
> witnesses. The court sustained defense counsel's objections and gave curative
> instructions to the jury on several occasions. Although we do not condone the
> prosecutor's statements, we find that the Judge's firm control over the trial
> obviated any prejudice to defendant that might have resulted from the
> Prosecutor's misconduct. We conclude that the prosecutor did not engage in a
> pervasive pattern of misconduct sufficient to deny defendant due process of law.

*People v. Chase*, 265 A.D.2d at 844 (citations and internal quotation marks omitted).

The Supreme Court has recognized that prosecutorial misconduct may "'so infec[t] the

trial with unfairness as to make the resulting conviction a denial of due process.'" *Greer v.

Miller*, 483 U.S. 756, 765 (1987) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643

(1974)). To rise to the level of a due process violation, the prosecutor's misconduct must be "'of

sufficient significance to result in the denial of the defendant's right to a fair trial.'" *Id.* (quoting

*United States v. Bagley*, 473 U.S. 667, 676 (1985) (in turn quoting *United States v. Agurs*, 427

-15-

U.S. 97, 108 (1976))). On habeas review, a  federal court is charged with distinguishing between ordinary trial error and the type of "egregious" misconduct that amounts to a denial of constitutional due process. *Floyd v. Meachum*, 907 F.2d 347, 353 (2d Cir.1990) (citing *Donnelly v. DeChristoforo*, 416 U.S. at 647-48); *United States v. Modica*, 663 F.2d 1173, 1178-81 (2d Cir. 1981) (*per curiam*), *cert. denied*, 456 U.S. 989 (1982)). Three factors are considered in determining whether a prosecutor's summation created "substantial prejudice": "'the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements.'" *Tankleff v. Senkowski*, 135 F.3d 235, 252 (2d Cir. 1998) (quoting *Floyd*, 907 F.2d at 355 (in turn quoting *United States v. Modica*, 663 F.2d at 1181)). In order for a prosecutor's comments in summation to warrant habeas relief, the "cumulative effect" of the challenged statements must have been so "inflammatory or egregious" as to "require a finding of substantial prejudice." *Bradley v. Meachum*, 918 F.2d 338, 343 (2d Cir. 1990) (finding that the prosecutor's improper behavior, limited as it was to the summation, did not permeate the trial, and holding that "[t]he clear evidence of guilt demonstrates that [petitioner] was not prejudiced by the prosecutor's improper remarks") (citations omitted).

In assessing whether Chase's right to due process has been violated, the Court first examines the severity of the prosecutor's misconduct. Unfortunately, the prosecutor commenced making his ill-advised remarks early in his summation, and continued to do so up until his last words to the jury. The prosecutor began by improperly denigrating the defense and bolstering the child complainant's testimony:

> There are typical defense tactics and Mr. LoTempio [defense counsel] employed them all. There is what we call shotgun approach. Stand back, load your gun with buck shot, point it in the direction, shoot a round or two, hope to hit something.

Hope to say yes, there is a little inconsistencies [*sic*] here. This means there is reasonable doubt he [defendant] did that.

There is the deny, deny, deny approach. He [defense counsel] did that, too. What does he tell you? We don't know if [the complainant] was raped. We don't know. There is not even an indication that sexual abuse occurred. I am going to tell you what, if you think there was and you believe that array of lying doctors. My guy didn't do it. What's the only testimony you have? [The complainant], the little girl who was raped. That's the only version you have that's the truth. That's the witness to the event.

Third tactic, blame somebody else. Now, Mr. LoTempio didn't have a name. And didn't certainly tell you well, I think it was a YMCA worker or could have been an old boyfriend you did it because he doesn't have a name because there is no other suspect. But he wants you to think when you get up there well, maybe it could have been somebody else. There is no other person. Do you think as talented as Mr. LoTempio was . . . do you think that that if there was somebody else, he would have asked [the complainant's mother] about that?

. . .

Fourth one – quite frankly, I was a little surprised at Mr. LoTempio's tact [*sic*] on summation. Fourth one, typically, I am a good guy. And Mr. LoTempio's words, Carl Chase is a stand-up guy. That's called character evidence. The Judge will tell you when she instructs you on the law that character evidence means nothing. It's just one more fact for you to consider in analyzing all of the evidence in the testimony.

. . .

He doesn't care about the facts. What he is doing is taking one little tidbits [*sic*], one little portion or piece of testimony, saying this is the entire case, this is it. Ladies and gentlemen, that ain't [*sic*] it.

. . .

Which is part of tactic number five. Everybody is lying. If you can't get them to say what you want them to say because that's not reality, if a doctor doesn't say to you yes, it could have been caused by something else, . . . he has got to be lying.

T.706-710. Defense counsel did not object to these remarks at the time.

When the prosecutor began to talk about the complainant's demeanor and testimony, he

improperly invoked religion, as the appellate division found:

I hope to God you all remember my question of you during jury selection. Do you think you would be comfortable taking the stand, putting your hand on the bible, looking at twelve people . . .

T.713. There was no objection from defense counsel. The prosecutor referred to the Bible again,

-17-

in a similar manner, near the end of his summation. There was no objection from defense counsel

at the time.

Prior to the second Bible reference, the prosecutor improperly commented upon Chase's

having exercised his Sixth Amendment right to consult with an attorney when the police wanted

to question him:

> Number two, and this may be even more compelling and more telling, Detective
> Crawford tells you that she contacted the Defendant, left a card at his mother's
> house. The Defendant knows the police are investigating this accusation that [the
> victim's mother] had levied on the telephone. When he [Chase] talked to her
> [Detective Crawford] last, detective says[,] you want to come into [*sic*] talk to
> me? He says no, I better get an attorney. Would that be your reaction?

T.727. Defense counsel did not object to this comment, and the court issued no curative

instruction at that time. The prosecutor then attempted to bolster his expert witness's testimony:

> Expert witnesses are not allowed to testify that a victim suffers from a particular
> syndrome. All they're allowed by law to do is tell you this is how a person
> behaved who is suffering from a particular psychological syndrome.

T.734. Defense counsel objected on the basis that the prosecutor's remark was a "misstatement"

and that the prosecutor was "getting into instructions" which is the province of the trial court. *Id.*

In response, the trial court stated that "the Jury's recollection will control as far as that witness's

testimony." *Id.* Defense counsel stated that he was not objecting on that basis; rather, his

objection was that the prosecutor was "saying expert witnesses as a whole can't give an opinion

as to whether somebody should, somebody fits into that category." *Id.* The court then explained

to the jury that "[e]xperts may testify to a syndrome, that syndrome involved [*sic*]. They may not

specifically testify as to whether the person involved in the case suffers from the syndrome."

T.734-35. This curative instruction was a correct statement of the law.

Several pages later in the summation, the prosecutor began defining reasonable doubt for

the jury: "She [the judge] is going to tell you that reasonable doubt is not based on some guess or

whim." T.739. When defense counsel objected to the prosecutor's instructing the jury on the law,

the judge stated that it was "allowable" and that if it went "too far," she would "say something."

*Id.* Predictably, the prosecutor continued in the same vein:

> She will tell you it's not a guess or a whim or a speculation. It's not a speculation.
> In fact, she is going to use this phrase, it's an actual doubt, it's one for which you
> can attach a reason. It is not some sneaking suspicion. It is not sitting up there in
> the deliberations room saying no, I didn't really like [the victim's mother], I
> think—

T.739.  After defense counsel objected again, the judge intervened, stating as follows: "I will

instruct the Jury, Mr. Schaffer, on reasonable doubt. You can give them an idea. I think when you

get down to detail, you may be going beyond what is proper summation." T.740.

The prosecutor's final comments to the jury were, in this Court's opinion, beyond the

pale of what is ethical and proper summation and deserving of official censure:

> I want you to do the only thing what [*sic*] your conscience will allow you to do,
> strike back. Strike back for that little girl. And Mr. LoTempio has told you not to
> be inflamed, you shouldn't be enraged. Ladies and gentlemen, I want you to be
> inflamed. You should me [*sic*] inflamed and enraged.

T.742. Defense counsel objected to this, stating that the comment was "contrary to the Court's

instruction about rational decision [*sic*] telling the Jury to become inflamed." *Id.*  The trial court

did not sustain counsel's objection but observed that "[t]his is argument. Argument is

summation, is not evidence. I think the Jury understands that." *Id.* Undeterred, the prosecutor

continued with his attempt to rally the jury's passions:

> I am not asking you to be irrational. I am not asking you to forget what you came
> in knowing. I am not asking you to ignore. I am asking you to be enraged and

> inflamed. Inflamed that [*sic*] the violation of a mother's trust. Inflamed that [*sic*]
> the violation of a little girl's affection. And inflamed at the fact that man put his
> penis inside [the complainant's] vagina. Thank you.

T.742. Defense counsel did not object again. The trial court issued no curative instruction at that

time.

At the end of the prosecutor's summation, defense counsel raised numerous objections to

the prosecutor's remarks, citing as authority a New York case holding that objecting after

summation has concluded is sufficient to preserve errors for appellate review. T.744. The trial

court agreed with defense counsel that further curative instructions were warranted (1) with

respect to the prosecutor's suggestion that the jury infer guilt from the petitioner's having

requested an attorney and (2) that the jury should rely on their emotions in coming to a decision

as to petitioner's guilt.  T.747-50. The court believed that the prosecutor's references to God

were "just a figure of speech" but agreed to "indicate that religion has nothing to do with this

case." T.749.

Before instructing the jury on the law, the trial court issued the following curative

instructions:

> . . . I must caution you with regard to several matters concerning the prosecutor's
> closing statement. First, it is a basic Constitutional Right that anyone accused of a
> crime has the right to an attorney. You must not infer guilt from the fact that this
> Defendant indicated that he wished to consult a lawyer. That is his absolute right
> and is not to be used by you as any indication that the Defendant is guilty of any
> of the crimes charged or any wrongdoing whatsoever. You must strike from your
> mind any reference made by the prosecutor to the Defendant's indication [*sic*] that
> he wished to speak to an attorney. Again, such indication is not to be considered
> by you during in [*sic*] your deliberations.
> Second, any references made by the prosecutor to God or religion or morality
> must likely [*sic*] be stricken from your mind and not considered by you during
> your deliberations. As I shall instruct you later, you are to decide this case based
> upon the evidence presented to you during the course of the trial and in

accordance with the rules of law I will shortly advise you of.
And finally, emotion and sympathy whether for or against the Defendant or
alleged victim has [*sic*] absolutely no place in your deliberations. Accordingly,
you are to strike from your mind the prosecutor's suggestion that you react
emotionally when deciding this case. Again, you are to deliberate in a calm
fashion and render a verdict based upon the evidence presented to you at the trial
and according to the legal instructions which I will now give to you.

T.752.

In determining whether a defendant has suffered actual prejudice as a result of the

prosecutorial misconduct, the reviewing court considers "'the severity of the misconduct; the

measures adopted to cure the misconduct; and the certainty of conviction absent the improper

statements.'" *Floyd*, 907 F.2d at 355 (quoting *United States v. Modica*, 663 F.2d at 1181);

*accord*, *e.g.*, *United States v. Germosen*, 139 F.3d, 120 128 (2d Cir. 1998), *cert. denied*, 525 U.S.

1083 (1999). The Second Circuit has explained that "[o]ften, the existence of substantial

prejudice turns upon the strength of the government's case: if proof of guilt is strong, then the

prejudicial effect of the comments tends to be deemed insubstantial; if proof of guilt is weak,

then improper statements are more likely to result in reversal." *United States v. Modica*, 663 F.2d

at 1181.

Among the factors to be weighed in the severity inquiry are the intentionality of the

misconduct and the extent to which the statements were made in response to defense contentions.

*Id.* There can be no doubt that the prosecutor's misconduct in this case was quite intentional,

although it was confined to his summation. There is no reasonable reading of defense counsel's

summation that would warrant the finding that the prosecutor's objectionable remarks were in

response to any remarks by defense counsel. *See Darden v. Wainwright*, 477 U.S. 168, 182

(1986) (finding no substantial prejudice, in part because "[m]uch of the objectionable content

was invited by or was responsive to the opening summation of the defense") (citing *United States v. Young*, 470 U.S. 1, 13 (1985)). Due to the horrible nature of the allegations against petitioner—that he forcibly raped an eight-year-old girl—the trial predictably was marked by some "passion and prejudice." *See Modica*, 663 F.2d at 1181 (stating that the reviewing court first must ask whether the improper comments were minor aberrations in a prolonged trial or cumulative evidence of a proceeding dominated by passion and prejudice) (citations and quotation marks omitted). The prosecutor deliberately attempted to play on the passions and prejudices of the jurors, of their probable desire to hold someone accountable for the alleged rape of a little girl. His closing remarks, when he attempted to whip up the jury into an emotional frenzy of righteous anger, were perhaps the most egregious. However, the prosecutor also implicated other specific rights of the accused, namely, the Sixth Amendment right to counsel. *See Darden v. Wainwright*, 477 U.S. at 182. Thus, the Court has no difficulty finding that the misconduct was severe.

Turning to the next part of the inquiry, the trial court did not issue many curative instructions during the summation, but then again, defense counsel did not object to most of the comments until after the prosecutor finished his closing argument. Although it would have been better practice for the trial judge to have interrupted the prosecutor *sua sponte* during summation, the trial court generally provided curative instructions when defense counsel did object contemporaneously, such as to the prosecutor's attempt to define reasonable doubt. In addition, prior to her general charge to the jury, the trial judge issued clear and thorough curative instructions with respect to the most inappropriate of the prosecutor's remarks–those that implicated Chase's right to counsel and that implored the jury to become inflamed. The judge

also instructed the jury that counsel's arguments were not to be considered as evidence in the case. In the absence of any indications to the contrary, this Court must presume that the jurors followed the instructions given to them.

With respect to the last prong of the *Modica* inquiry, the Court finds that the evidence of Chase's guilt was exceptionally compelling. J.D. testified without significant impeachment that the man she knew as "Mr. Carl" put his "dick" into her "girl thing" Even if Goodrum was only gone from the house for nine instead of twenty-five minutes, as the defense suggested, Chase still was alone with J.D. for a sufficient amount of time to walk from the sitting room down the hall to her bedroom and commit the sexual assault that J.D. described. Chase's clothes were in disarray when Goodrum arrived home, which comports with J.D.'s testimony that Chase's attack on her was interrupted when he heard the front gate slam, signaling Goodrum's return.

Furthermore, the medical testimony was unequivocal. The complainant had an abnormally reddened vagina and a whitish vaginal discharge. The nurse practitioner and the sexual abuse expert both testified that the complainant had tears in her vaginal tissue, the placement of which were consistent with having been caused by penetration by an erect adult male penis. In fact, the expert testified that it was a "high 90% likelihood" that the tears were caused by a penis. He definitely ruled out the possibility that J.D. could have inflicted these injuries on herself. Moreover, there was no suggestion that J.D. was masturbating or inserting objects into herself, or engaging in sexual play with any other individual. Given the foregoing medical testimony (which defense counsel was unable to contradict), along with the fact that Chase was the only person with the means and the opportunity to commit the crime, the Court is convinced of the certainty of Chase's guilt.

In light of the testimony offered at Chase's trial, I cannot find that the prosecutor's misconduct substantially prejudiced Chase's right to a fair trial. The evidence of Chase's guilt was extremely compelling. Under such circumstances, there was no need for the prosecutor to resort to misconduct; had the prosecutor played by the rules, he still most certainly would have secured a conviction against Chase.

Even though the Court has not found that the prosecutor's conduct was so prejudicial as to have denied Chase a fair trial, the Court is nevertheless very troubled by the prosecutor's blatantly improper conduct. As the Second Circuit noted in *Modica*, "'The appellate tribunals have found to dismay that they cannot uphold a conviction and yet successfully condemn the method by which it was secured. Carefully written opinions condemning the indiscretion and misconduct have not been successful to curb improprieties. The very act of upholding the conviction has given prosecutors approval, and the "judicial slap on the wrist" has not deterred the prosecutor from his unethical and improper tactics.'" *Modica*, 663 F.2d at 1183 (quoting Note, Prosecutor Indiscretion: A Result of Political Influence, 34 IND.L.J. 477, 487 (1959)). The Second Circuit further observed that "[r]eversal is an ill-suited remedy for prosecutorial misconduct; it does not affect the prosecutor directly, but rather imposes upon society the cost of retrying an individual who was fairly convicted." *Modica*, 663 F.2d at 1184.

Furthermore, because the Court is only sitting in collateral review of this matter, it does not have the jurisdiction to judicially sanction a prosecutor or issue contempt penalties against him. So strong is this Court's disapproval of the prosecutor's misconduct that were this Court possessed of the requisite jurisdiction, it would most probably issue sanctions. Lacking such jurisdiction, the Court can only employ the power of words.  In that spirit, in addition to

comments already made, the court offers the following: State and Federal trial courts are courts

of law, with rules of evidence and rules of conduct based on strong public policy considerations,

carefully constructed by our forefathers and protected over the centuries in well-established and

time-tested rules and precedent; they are not television crime shows where theatrics and

entertaining misconduct are routinely scripted to appeal to viewers—where, in convicting the

"bad guys," the ends justify the means.  The Court admonishes the prosecutor to carefully review

New York state's evidentiary law, the Federal Rules of Evidence, the ABA Model Code of

Professional Responsibility, the ABA Model Rules of Professional Conduct, and the ABA

Standards for Criminal Justice so that he may familiarize himself with the proper manner in

which to conduct himself when prosecuting a case on behalf of the People of the State of New

York.

## CONCLUSION

For the reasons stated above, Carl Chase's petition for a writ of habeas corpus pursuant to

28 U.S.C. § 2254 is denied, and the petition is dismissed.  Because Chase has failed to make a

substantial showing of a denial of a constitutional right, I decline to issue a certificate of

appealability. *See* 28 U.S.C. § 2253.

**IT IS SO ORDERED**

/s/ *Victor E. Bianchini*

_____

VICTOR E. BIANCHINI
United States Magistrate Judge

DATED:  December 8, 2005
     Rochester, New York.

-25-